06-1046 Good morning, my name is Merrick Blakes, I live in Kiefer, Oregon. And I'm counsel to Appellant Kaiyuan Group Corporation. But as you know, for purposes of today's argument, I'm appearing on behalf of all the plaintiff appellants. As you know, there are two issues before the court. I'd like to begin first with what I'll call the wax issue. This is an issue which I would submit, where I'd submit is an issue about whether a correction was made in a timely manner or not. It is therefore a substantial evidence issue, and I'd like to briefly review that evidence. And I believe I would submit that if it's accepted that the correction was made in a timely manner, then the legal issues resolve themselves. Commerce conducted an administrative review of Kaiyuan. I'd like to, for purposes of convenience, refer to the two entities of supplier and exporter here, Kaiyuan and White Zoo, simply as Kaiyuan, for purposes of simplicity. But conducted an administrative review of Kaiyuan that worked precisely as it was designed to work up to a point at which there was a ministerial error and the process went off the tracks. Well, it was Kaiyuan's error, right? It wasn't Commerce Department's error. I will look up. The initial error was Kaiyuan's. The initial error was corrected in a timely manner. Why was it timely? Wasn't it communicated only after the publication of the final results? No, Your Honor. It was communicated pursuant to customs instructions at the end of the verification period. And then this was, Commerce, excuse me, missed the fact that the correction had been made. When the fact that the correction had been made was missed, was called to Commerce's attention by Kaiyuan after the final results, Customs said the error was yours. It was never corrected. It's untimely to correct it now. But let me explain why the correction was made and was made in a timely manner. In its initial questionnaire response, Kaiyuan explained that it used wax at only one point in its production process to heat the slats that go into the pencil sheets. It was asked in a supplemental questionnaire for more information generally on its raw materials inputs. It provided invoices about the wax that it purchased. And it explained that this was an industry standard product whose use was dictated by the responsible state regulatory agency. To go back for a moment to the initial question. The issue was petrol versus paraffin, right? Yes, Your Honor. Are you saying the original statement was simply generically wax? It was generically wax with one exception. There were three references to wax in the initial questionnaire response and one erroneous reference to petrol wax. And in that reference, it also provided specifications for petrol wax, which were also erroneous. The investigative phase continued and it culminated with verification. Prior to verification, the Commerce Department, as it does, propounded a voluminous set of questions in what's called its verification outline. And it asked specifically for Kiwan to have ready for verification the documentation necessary to, quote, correctly identify the grades of all material inputs. To avoid any misunderstanding, Commerce gave Kiwan a list of the inputs it wanted documentation on, including the input that Commerce called wax. Verification, as you may know, in this case was a four-day process, but it's a process where Commerce officials go to the company in question and go over the documentation that supports the answers that they've given to their questionnaire responses. Commerce spent four days doing this with first two days with Kiwan, two days with Whitesu. And at the end of that process, within the time limit set by Commerce, and according to Commerce's instructions, Kiwan provided what it called specifications and minor corrections. It very clearly identified that it was correcting information that had been provided earlier in the review. It stated that it was doing so because issues had arisen, it said, prior to and during verification. And so at the end of verification, it corrected this information, including specifically information about wax. The context here is the end of a four-day verification, which is a dialogue, about the company's manufacturing and export procedures. Is this the June 4th, 2002 document you're talking about? This is the February document. The February 9th document, the additional information document. It actually carries two dates, but yes, February 8th, February 9th. That is the document I'm talking about. I'm trying to track the documents while you're talking. Okay, fair enough. Do you need a record site? No, I just need to know what document you're talking about. If you're talking about the February 9th document titled Additional Information, that's helpful. Yes, but I would actually call your attention to the cover letter of that document, which gives the transmittal letter, which is what I was citing to, which specifically says it was minor corrections. What's the appendix site to that? That's J211. We hereby respectfully submit certain information for the record and minor corrections to information provided in the past. Minor corrections to information submitted in the past became necessary to ensure that the record correctly and accurately displays quantities and values, raw material amounts, and specifications. This really isn't such a minor correction, is it? Well, I think it is, Your Honor. I think what has been corrected here is the type of wax. It's not something called petrol wax. It's something called paraffinic max, that is a wax with a paraffin content. And in addition, what is corrected is the melting point. But that document didn't actually challenge the use of the surrogate petrol wax, did it? Not expressly. Not expressly. But the reason that I would submit that this was clear as a correction, first, is that it's characterized as a correction. But second, we're only talking about a single wax product. Wax is only used at one point in the production process, to heat the slats. And therefore, there's no possibility for ambiguity. Commerce asked about wax, and my client replied that the wax in question, the additional comments on J217, is paraffinic max and it corrects the melting point. Thank you. The investigative phase of an administrative review is an iterative process, where commerce elicits the information needed to make its determination. And here, that process worked perfectly up to this point. Commerce went on, however, and calculated a margin based on a surrogate value for something, for an HTS number that it attached to petrol wax. That was commerce's error. It was an inadvertent error, it was a ministerial error, when that error was brought to commerce's attention after the final results were issued. And this was the first time that Kiwan was in a position to know that commerce had not internalized and relied on its correction. So when it made that point, after the final results, commerce said, oh no, the error was your error. You told us it was petrol wax, and you never corrected that. It's too late to correct it now. It's not our error, it's yours. When you all responded on June 4th to the department's verification, questionnaire verification, you didn't say anything about the wax problem. I'm sorry, Your Honor. In your June 4th brief in response to the department's verification, you didn't say anything about the wax problem. We did not, nor did we have any particular reason to, because the verification report was issued following verification, the following receipt of these minor corrections never raised this as an issue. We had every reason to expect that this correction had been accepted and acted on, and it was only after the final results that we could see for the first time that indeed that had not happened. I'd like to, and I realize that I'm into my rebuttal time, I'd like to make one point very quickly, and that is that in the brief of General Corporation, they have asserted that the HTS number that Commerce relied on to derive its surrogate value was an HTS number that in any event included paraffin wax, and therefore that the selection of the surrogate value was not facially inaccurate. That is simply wrong. The Indonesian HTS numbers differentiate at the 10-digit level between the HTS number relied on by Commerce, which is the 900 number, .900, which Commerce characterized as other petroleum jellies, other petroleum jelly. That number is differentiated from the suffix 100, which is other paraffin wax. In other words, the HTS number selected by Commerce was one that expressly excluded any paraffin wax. How big an issue is this? I mean, how much change would there be, do we know? I can't give you an exact number. It is an issue that's sufficiently important to my client that they have asked me to bring it to this tribunal. It is an important issue to them. We'll save the remainder of your time, Mr. Blake. Yes, thank you. I will. Mr. Panzera for the government. And you're dividing your time 9 and 6 with Mr. Thompson. That's correct, Your Honor. May it please the Court. This Court should affirm the trial court's decision sustaining Commerce's rejection of Kaiyuan's purported ministerial error claim regarding petrol wax as a factor of production, as well as Commerce's evaluation of pencil cores because Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. Throughout Kaiyuan's argument, they repeatedly state that their attempt to correct the mistranslation, which they admit was their own error, was timely. However, Kaiyuan sidesteps the fact that Commerce specifically requested back in October of 2001 for values with respect to petrol wax. On page 506 of the joint appendix, there's a list where it specifically indicates number one on the list is petrol wax. Kaiyuan did not respond to Commerce's request. There's no explanation for its failure to do so. December of 1, at 171 in the joint appendix, Commerce listed in its factors of production petrol wax. So this alleged error that was reported by Lai Zhou in its submission on page 131 of the record continued throughout Commerce's communications with Kaiyuan and Kaiyuan failed to correct it. The deadline for submitting factual information pursuant to 19 CFR 351.301.B2 is 140 days after the last day of the anniversary of the order. So that would put the deadline at June of 01. This letter that Kaiyuan is referring to was not submitted until February 9th of 02. And he's saying that it took place on the last day of verification. In his own submissions, he indicates that verification took place between the 4th and the 8th of February. The letter was not submitted until the 9th. If you look at the actual document that he's referring to, the certification on page 213 of the joint appendix indicates that it was served on February 9th. So in any event, it was after the 140-day deadline. It was after verification. And it did not arise out of verification. There is no indication in the verification report that this was at issue, the difference between petrol wax or paraffin wax. And if anything, it arose when commerce brought to the party's attention that it lacked a value for petrol wax. That was the opportunity that Kaiyuan had to correct any alleged error in mistranslation. Now, that is not the only opportunity that Kaiyuan would have to correct any alleged error. Under Timken, Kaiyuan has the opportunity in its case brief to provide reliable evidence that it used a particular factor of production that was not in accordance with previous submissions. However, no such evidence was given in its case brief as to this issue. So to the extent that Kaiyuan relies on this particular submission, this purported correction, if you look at the actual correction on page, at the alleged correction on page 217, you'll realize that it does not even refer to petrol wax. And it's not clear whether it was intended to replace petrol wax or any other factor of production. So to the extent that they contend that it was clear, then under peer bearing, this by its nature is not a ministerial error. And it instead relates only to interpretation, which is an error in judgment. So to the extent that they allege that commerce failed to understand or appreciate what they were reporting to be an error, then under peer bearing, that fails on its face as a ministerial error. Turning to the other issue regarding the evaluation of pencil cores, I just want to point out one issue here. Before the CIT, Kaiyuan argued that the agency should use Indonesian values, the Indonesian import data, to value the pencil cores. And they've changed their story on appeal. They're now saying that commerce should have used the price list and the price quote. And as the trial court explained in its decision, the price quote that the Indian data was reliable because even though it was small in value, that the weighted average Indian import prices was comparable. And because India was the primary surrogate, commerce had sufficient information, substantial information on the record to use that data. So for these reasons, we request that the court affirm the lower court's decision. Thank you. Thank you, Mr. Panzara. Mr. Thompson, you've been left with more than six minutes. But you needn't use, but you may. I'll try to keep to the original six minutes, Your Honor. I'm George Thompson of the law firm Neville-Peterson, appearing on behalf of defendant F. L. Eves, who are the petitioners in the underlying anti-dumping proceedings. I'll limit my comments to the wax issue, which, as we heard, came up. The argument seemed to wax and wane. I want to erase that from the record. The issue of whether or not commerce used the correct wax was raised literally after the 11th hour, or after midnight hour in this case, long after the record had closed, long after the briefs had taken place. And that's an important point to keep in mind, because throughout the investigation, Kaiyuan had ample opportunity to put forth any alleged errors or to address any alleged errors that had been committed either by it or by commerce, and they ignored all the proper procedures for the better part of a year. For example, in the original Section D questionnaire response, which is where Kaiyuan, like other Chinese respondents, identified the materials that are used in producing their products, Kaiyuan identified petrol wax explicitly in his questionnaire response and gave a melting point range. The ministerial error, so-called, that was issued nearly a year later does not address any supposed error in the questionnaire response. On its face, it only talks about translation errors, supposed translation errors, in invoices that were submitted months after the original Section D. So there's nothing on this record at all, even an allegation by Kaiyuan, that there was an error in the original Section D response where it reported explicitly that it used petrol wax. Then we heard in February 2002, Kaiyuan's council submitted a post-verification letter to commerce in which it pointed out certain changes to affect quantities and values, raw material amounts, and specifications. Well, nowhere in this letter is there a statement that the raw material that had been reported in any prior questionnaire response or supplemental response was incorrect. So on the face of this letter, there was nothing to alert commerce to the subsequent allegation or to have any idea that the factor of production, the raw material, petrol wax, had somehow been mis-described. We heard Councilor Kaiyuan say before that they had no reason to address the petrol wax issue in the case briefs because they assumed that there was going to be a correction in the calculations after verification. If you look at the verification report in this case, it shows that commerce did not address the petrol wax issue. Now, somebody looking at the verification report and trying to determine, well, did commerce understand at verification that we were telling them that we had misreported the factor of production, that it wasn't petrol wax? Somebody looking at the verification report and not seeing that address, there should know, must know, that that's an issue to raise in the case briefs. Kaiyuan failed to do so. It addressed certain other issues, but it failed to address the petrol wax issue at all, and therefore, at a minimum, has to be deemed to have waived that issue under doctrines of exhaustion as well as the Commerce Department's own regulation concerning case briefs. I'd also point out that the reference to paraffinic max, not wax, paraffinic max, with a changed melting point does not state that paraffin wax was being used. The reference to paraffinic is, to my mind at least, ambiguous at best. What is a paraffinic max? Is that a term of art for some product or something? I've never heard of it before, but... Was it a misprint? Was it a typographical error? They haven't claimed that. But I would point out that much earlier on in the proceedings, at petitioner's request, Commerce sent Kayiwan a supplemental questionnaire saying, please describe, please tell us the specifications and the chemical compositions of the products that you, of the raw materials that you use in your pencil production. And Kayiwan came back and said, we just buy this stuff. We can't tell you. This is a paraphrase, of course. But we buy this material off the shelf. We don't know what the specifications are. Now, even taking that at face value, had Kayiwan provided us with guidance on what goes into its petrol wax, along with its other raw materials, but on what goes into its wax, we would know the paraffin content. We don't have that information simply because Kayiwan refused or was unable, and it really doesn't matter which, to provide that information despite an explicit request from Commerce. So here they are, after every opportunity to provide the information, to make their arguments, literally after the determination comes out. They assert, without any reference to the record, that now their product has a different composition than what they had represented for the full year preceding the final determination. So, in closing, I point out that Kayiwan was too late in pointing out the alleged error, and second, based on the ministerial error's allegation, there has been no assertion that the original Section D response reporting that they used petrol wax was incorrect. That stands uncorrected, and there's no reason to believe that that was wrong in the first place. Thank you. Thank you, Mr. Thompson. Mr. Blakeslee has a little time left. More than three minutes. Yes, thank you. I'd like to quickly address three points. The first one is the suggestion by counsel for the government that the ministerial minor corrections on February 8th or February 9th was somehow not timely submitted. That's simply inaccurate. The government has a regulation that requires  any untimely filed submission by a respondent. It did not reject that. Therefore, it accepted the correction and accepted it as timely. Now, is there a distinction between accepting a document as timely and accepting the correction? Let me come to that point. The document itself was accepted as timely. The reason that I believe it's clear that this was an inadvertent error on to take account of what was clearly labeled as a correction is the fact that, and this is, I'd refer you to page 289 of the record, in Commerce stated that we made minor corrections identified at verification. In other words, it said on the record that it made, that it incorporated these minor corrections when indeed it missed out the wax correction. What is paraffinic wax? Well, I take your question before. What I can tell you is that it is, I believe, and this is only a belief, I believe it's one of two things. I believe it's either a proprietary name for a wax product that clearly has paraffin content  as you suggested, Judge, it may be a typographical error for paraffinic wax. The W was tipped over? The W was rolled over. I don't know which it is, but in either case it is sufficiently transparent to have put the to have alerted the department to the fact that we were dealing with a paraffin wax. Well, let me ask you this question. Do you think you all are the only people who import pencils into the United States? We do not. This is an exporter and supplier. Well, export But I'm certain there are a great many exporters and suppliers of pencils. Right. And you do agree, would you, that commerce deals with other exports besides pencils? My point simply being is that a lot of paper flowing through commerce's mall and they look at a lot of documents and I'm having a little trouble working through if I were working in the bowels of commerce somewhere processing all this paper and a paper came in with a single word, perhaps misspelled, that that would ring bells in my mind that would tell me, aha! They have corrected a significant question about the kind of wax. Isn't that a little stretching the case a bit? No, sir. I don't believe it is. What commerce does, what commerce is good at is parsing out the factors of production of respondents in non-market based economies. And they've got little people who go out and do all of that. Absolutely. But I'm talking about this one piece of paper floating through the machinery with all kinds of stuff in it and one word, a strange word, paraphonic max. What would you make of that if you were sitting there looking at that? What commerce is tasked with doing, what normally they do properly, is to look individually at each respondent's factors of production to track them through and then to come up with a surrogate value for those. We were dealing with wax used at one point in this respondent's production process. We began by calling it wax and once petrol wax we submitted a document that said this is a correction to what we told you earlier. Wax is indeed something called paraphonic max. And by the way, we got the melting point. Were there other corrections in that piece of paper? Yes, sir. Everything in there is a correction. Do you have one concluding simple sentence? Yes, I do. The reference by government counsel to JA 506, which is a request that Kiwan provide, it was an opportunity for Kiwan to provide a suggestion on a surrogate value for petrol wax is different. The commerce requires information on materials and specifications. It invites the parties to submit suggested information on proper surrogate values. That document is irrelevant to the query Kiwan fully complied within the proper time limits with the obligation to provide complete information on quantities and technical specifications of its inputs including this wax product. Thank you, Mr. Blakeslee. The case is taken underway.